[Cite as *State v. Ford*, 2018-Ohio-3563.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
### No. 105865

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# NATHAN FORD

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-598281-A

**BEFORE:** Kilbane, P.J., E.T. Gallagher, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** September 6, 2018

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
Rick L. Ferrara, Esq.
2077 East 4th Street
Second Floor
Cleveland, Ohio   44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
Mary Weston
Christine M. Vacha
Daniel T. Van
Assistant County Prosecutors
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, P.J.:

**{¶1}** Defendant-appellant, Nathan Ford ("Ford"), appeals his convictions for rape and kidnapping. For the reasons set forth below, we affirm.

**{¶2}** In 2006, Ford was convicted of raping multiple victims over an eight-year span between 1996 and 2004. He was sentenced to more than 100 years in prison for these rapes and other offenses. This court affirmed his convictions in *State v. Ford*, 8th Dist. Cuyahoga Nos. 88946 and 88947, 2007-Ohio-5722. Ford's DNA was identified as a match on sexual assault collection kits that were submitted to the Ohio Bureau of Criminal Identification and Investigation ("BCI") for testing and examination, which resulted in the charges in the instant case.

**{¶3}** In August 2015, Ford was charged in a 13-count indictment for four separate incidents involving four separate victims. Ford was charged with five counts of rape, one count of aggravated robbery, five counts of kidnapping, and two counts of felonious assault.[1] Counts 1-5 relate to Jane Doe 1 (date of offense August 29, 1995); Counts 6-8 relate to Jane Doe 2 (later identified as K.H.) (date of offense November 5, 1998); Counts 9-11 relate to Jane Doe 3 (later identified as W.W.) (date of offense April 16, 2000); and Counts 12-13 relate to Jane Doe 4 (later identified as A.W.) (date of offense July 24, 2000).

---

[1] Ford's charges also included firearm specifications and sexually violent predator specifications.

**{¶4}** Prior to trial, the state of Ohio dismissed Counts 1, 2, 3, 4, 5, 7, and 10 of the indictment. Consequently, the indictment was reordered as follows: Count 6 became Count 1; Count 8 became Count 2; Count 9 became Count 3; Count 11 became Count 4; Count 12 became Count 5; and Count 13 became Count 6.

**{¶5}** The matter proceeded to a jury trial in June 2016. Ford waived the right to a jury as to the sexually violent predator specifications. The following evidence was adduced at trial.

### Sexual Assault of K.H.

**{¶6}** On November 5, 1998, K.H. was walking home at night along West 65th Street. As she reached the area of West 65th and Madison Avenue, she was approached by an unknown African-American male, later determined to be Ford. K.H. testified that Ford was friendly at first, and walked along the street with her for a few blocks. They were at the intersection of West 65th Street and Franklin Avenue, when "out of nowhere," Ford put her in a choke hold and dragged her from the street, along a fence, and behind a building. K.H. testified that Ford's demeanor changed to being "vicious" and "violent." He forced her down onto the ground. Ford strangled her and punched her in the face so hard that she lost consciousness more than once.

**{¶7}** Ford ordered her to lower her pants and take one pant leg off and leave one on. Ford threatened to smash her face into the brick side of the building. Ford got on top of her and penetrated her vagina with his penis. K.H. testified that Ford was not wearing a condom and he ejaculated inside her vagina. Ford eventually stood up and

told her not to move for five minutes. He "threw a couple dollars" at her and then left. K.H. laid on the ground for a few minutes because she was in physical pain. She then straightened herself up and began to walk home. On her way home, she flagged down police officers and told them what happened. The police officers took K.H. to Lutheran Hospital, where she was treated for her injuries and where medical professionals completed a sexual assault kit examination. Samples were collected and included as part of a rape kit, which was sealed and sent for testing years later. K.H. had bruising to her eyes, and bruises on both hands, and a blister on her finger from hanging on to the fence.

{¶8} K.H. followed up with the Cleveland Police Department and looked through mug shots trying to identify her attacker, but was unsuccessful. In 2015, Investigator Sahir Hasan made contact with K.H. and interviewed her.

{¶9} Melissa Zielaskiewicz ("Zielaskiewicz"), a forensic scientist in the biology DNA section at BCI, testified that the vaginal swabs from K.H.'s rape kit contained a full male DNA profile consistent with Ford's DNA. Zielaskiewicz testified that the odds of the DNA profile on the vaginal swabs and the anal swabs being someone other than Ford is "one in 12 quadrillion, 120 trillion unrelated individuals." Zielaskiewicz's results were technically reviewed by two other scientists at BCI who agreed with her findings.

Sexual Assault of W.W.

{¶10} W.W. did not testify at trial. W.W. was an international student from China, attending Cleveland State University ("CSU") at the time of the attack. On April 16, 2000, Officer Alanna Smith ("Officer Smith"), who was employed by Cleveland State

University Police Department at the time, was dispatched to Stilwell Hall, which housed the engineering department. Officer Smith spoke with W.W., who described her assailant as a black male, approximately 25-35 years of age, 5'10" to 6" tall, with short hair and a mustache. The victim described the male as wearing gray clothing. Officer Smith transported W.W. to St. Vincent's Charity Hospital for a sexual assault examination.

{¶11} Dr. Therese Wolpaw, M.D. ("Dr. Wolpaw") testified that she treated W.W. on April 16, 2000. At the time, she was employed as an emergency room physician at St. Vincent's Charity Hospital. In treating W.W., Dr. Wolpaw took a history from W.W. as follows:

> This is a 27 year-old otherwise healthy woman who was well until this afternoon when she states that she was raped. She was working at [CSU] where she is an engineering student. She went to the restroom and was followed by a man into the restroom. She states that he told her that he wanted to have sex with her and that if she refused he would hurt her and kill her.
>
> She states that she fought him and that he hit her in the head, nose, neck, right eye and stomach. She continued to fight him but he was much bigger than she was. Consequently he went on and penetrated her vagina. She states that he wore a condom. She does not recall any oral penetration but thinks that there may have been some rectal contact. At this present time she has a great deal of pain along the back right side of her head, over her nose, along her neck and in her right eye. She states that her vision is not disturbed but her eye is painful.

{¶12} Dr. Wolpaw conducted a physical examination and noted W.W.'s injuries. Computer tomographic ("CT") scans revealed that W.W. suffered multiple fractures to her nose, and a fracture to the socket of her right eye. She had abrasions to her right eye,

nose, and ears, and blood along her inner thighs. Dr. Wolpaw testified that W.W.'s facial injuries were consistent with being punched in the face. Dr. Wolpaw collected a sexual assault kit from W.W. W.W.'s clothing was also collected, which consisted of one short-sleeve sweater, one long-sleeve sweater, one bra, and one pair of socks.

{¶13} Sergeant Richard Flaherty ("Sergeant Flaherty"), a detective with the CSU Police Department, was employed as a patrol officer at CSU in 2000. He responded to the scene of the incident. Sergeant Flaherty received the radio broadcast of the suspect described as an African-American male, 5'10", muscular build, and with gray clothing. As part of his investigation, Sergeant Flaherty learned that W.W. was a student at CSU and Ford had been a student at CSU between 1988 and 1993.

{¶14} Andrew Sawin ("Sawin"), a forensic scientist in the DNA section of the BCI, testified that testing detected a male DNA profile on a cutting from W.W.'s shirt. Lynda Evelyth ("Evelyth"), a forensic scientist with the BCI, compared the DNA profile from W.W.'s shirt with the known standard of Ford's DNA. Evelyth testified that Ford could not be excluded as a contributor of the DNA from the shirt and based upon the database, the proportion of the population that could not be excluded is 1 in 1,441,000 unrelated individuals. Evelyth concluded that the DNA profile on W.W.'s shirt matched Ford's DNA. Evelyth's conclusions were technically reviewed by two other scientists at BCI, who agreed with her findings.

<u>Sexual Assault of A.W.</u>

**{¶15}** A.W. testified that sometime after midnight on July 24, 2000, she was driving down Clark Avenue intending to go to a corner store near West 56th Street to buy cigarettes. She was 19 years old at the time. A.W. parked her car on Clark Avenue, in front of Clark Elementary School, and walked over to the front of the store. As she approached the store, she realized that it was closed. She turned around and started walking back to her car when a stranger, later identified as Ford, approached her. Ford said something to her. A.W. does not remember exactly what he said, but remembers that Ford initially spoke to her in a friendly tone. Suddenly, Ford became aggressive and grabbed her. He pulled A.W. across the street and onto the property of Clark Elementary School. He dragged her around the corner of the building to a grassy area behind the school.

**{¶16}** Ford placed his hand around A.W.'s throat and covered her mouth with his other hand. He "choke slammed" her to the ground and put his weight on top of her. A.W. testified that Ford "was trying to calm me down so he could remove his hand from my mouth without having to worry about me screaming." A.W. recalled "hyperventilating" and " freaking out." Ford ordered A.W. to undress and lay her clothes on the grass as if she was putting a blanket down. A.W. complied because she feared that if she did not, she would not be able to get away, and Ford would hurt her. Ford forced A.W. to perform fellatio on him and then he penetrated her vagina with his penis. A.W. cried while she was being raped. She does not remember Ford using a condom.

{¶17} After Ford finished, he instructed A.W. to keep quiet and stay where she was at. He left with her pants. After he fled, A.W. waited until she felt he was far enough away and grabbed her remaining clothes. She found her pants on a guardrail, put them on and came out from behind the school. She got in her car and drove around trying to find him.

{¶18} Unable to locate Ford, A.W. then drove to the Cleveland division of police second district police station. She was taken to MetroHealth Medical Center where she consented to a sexual assault kit examination that included, among other things, collections from her vagina. Later in July 2000, A.W. responded to the Cleveland Police Department, Sex Crimes Unit, where she looked through mug shots in vain, trying to identify her attacker. She eventually stopped going back to look through mug books because her attacker's face was a blur to her, and she did not want to make a mistake and identify the wrong person. A.W. did not hear anything else about her case for 15 years, until she was contacted by Investigator Hasan.

{¶19} Dr. Mohak Dave, M.D. ("Dr. Dave"), testified that he was employed by MetroHealth Medical Center as an emergency room physician when A.W. came to the hospital on July 24, 2000. Upon arrival at the E.R., A.W. was "tearful, tremulous, [and] had] red marks [on her] neck." Dr. Dave described A.W.'s neck injuries as "abrasions in a ring fashion to the neck," which was consistent with someone having grabbed A.W. around her neck.

**{¶20}** A.W. told Dr. Dave that she was forced to perform oral and vaginal intercourse with an unknown male about one hour prior to arriving at the hospital. Dr. Dave treated A.W. and collected specimens from her body as part of a sexual assault kit examination, including collections from her vagina.

**{¶21}** Evelyth testified that she analyzed the vaginal swabs and the anal swabs from A.W.'s rape kit and discovered a full male DNA profile consistent with Ford's DNA. Evelyth communicated her confidence in the DNA match with the odds of the DNA profile on the vaginal swabs and the anal swabs being someone other than Ford is "one in 12 quadrillion, 120 trillion" unrelated individuals. Evelyth detected another male DNA profile on A.W.'s underwear, which belonged to A.W.'s boyfriend at the time of her attack. Evelyth's conclusions were technically reviewed by two other scientists at BCI, who agreed with her findings.

Ford's Defense

**{¶22}** Dr. Barry Layton, Ph.D. ("Dr. Layton") is a neuropsychologist and was the sole witness for the defense. Dr. Layton testified that he evaluated Ford "in an attempt to understand [Ford's] mental state at the time of the rapes and associated crimes that are the subject of this trial." In preparing his report for this case, Dr. Layton reviewed: Ford's medical records from the Ohio Department of Rehabilitation and Correction, his own neuropsychological evaluation that he conducted in 2006, a 2005 competency evaluation, a 2006 sanity evaluation, a 2006 sexual predator evaluation, a March 2016 competency and sanity report, and an October 2016 sanity evaluation.

{¶23} Dr. Layton testified that he conducted a clinical interview of Ford and administered several psychological tests that resulted in "reasonably normal" findings. When Dr. Layton interviewed Ford in 2006, he took a "history" from Ford, wherein Ford told Dr. Layton about his life. When Dr. Layton conducted his 2017 report, he took a much more extensive history from Ford. As a result, Dr. Layton uncovered more detail about Ford's early upbringing, childhood, and adulthood. Dr. Layton also got more detail as to Ford's history in the prison system after 2006 until the present. According to Layton, Ford viewed the earth as a construct where "orchestrators" poisoned his food and attempted to kill him. The poisoning caused him horrible pains in his body, especially his abdomen. Ford identified the "orchestrators" as women who not only poisoned him, but also prevented Ford from receiving the therapy that he needed to get rid of the pain. According to Ford, the therapy was sex, so Ford used sex as means of therapy for his condition. Dr. Layton testified that Ford suffered from "acute psychosis" when he committed the rapes.

State's Rebuttal Witness

{¶24} The state called Dr. Thomas Swales, Ph.D. ("Dr. Swales") as a rebuttal witness to Dr. Layton. Dr. Swales testified that psychosis is a psychiatric symptom, not a diagnosis. On cross-examination, the state questioned Dr. Layton about malingering (a gross exaggeration of symptoms of illness to avoid consequence) and if Ford was malingering. Dr. Swales testified that for every neuropsychological case evaluation,

some test for malingering is always administered. Dr. Swales further testified that he has administered malingering tests hundreds of times.

{¶25} Dr. Swales examined Ford and conducted evaluations to determine Ford's competency to stand trial and Ford's sanity at the time of the act. Dr. Swales testified that Dr. Layton's report was not clear on what type of evaluation Dr. Layton was conducting — evaluation for competency or sanity at the time of the act. Dr. Swales testified, "it seemed [Dr. Layton's report] gloss[ed] over a great deal of evidence that [he] had reviewed that for some reason Dr. Layton had not reviewed." Dr. Swales further testified that he had some concerns about Dr. Layton's report. First, whether all of the information available in the test data was included in Dr. Layton's report. Second, Dr. Swales testified that Dr. Layton diagnosed Ford with a delusional disorder (a completely irrational belief because of an underlying medical condition), yet Dr. Swales did not find any evidence in Ford's medical records of a medical condition. Third, Dr. Swales was concerned with why Dr. Layton diagnosed Ford with a delusion disorder, but did not see any analysis of why Ford "would have a delusion that would account for him allegedly raping women. It didn't make sense."

{¶26} Dr. Swales's review of the examinations and evaluations show a concern that Ford was malingering psychiatric problems. Dr. Swales opined that Ford did not have a severe mental disease at the time of the offenses. He further opined that Ford knew the wrongfulness of his actions at the time of the offenses. Dr. Swales believed that Ford has a malingered psychosis as opposed to a true psychosis. Most people with

psychotic disorders are not able to go to school and not able to work because of the dysfunction the psychosis creates.

**{¶27}** At the conclusion of trial, the jury found the defendant guilty of rape as charged in Counts 1, 3, and 5. The jury also found the defendant guilty of kidnapping as charged in Counts 2, 4, and 6.

**{¶28}** The trial court held a sentencing hearing in September 2017, as well as the sexual predator hearing. The court found Ford to be a sexually violent predator. With regard to his sentence, the court determined that Counts 1 and 2 do not merge; and Counts 5 and 6 do not merge. The trial court found Counts 3 and 4 merge. For purposes of sentencing, the state elected to proceed on Count 3. The trial court sentenced Ford to a sentence of 20 years to life on each remaining count and ran them each consecutively for an aggregate sentence of 100 years to life. This sentence was run consecutive to Ford's existing sentences.

**{¶29}** Ford now appeals, raising the following six assignments of error for review.

<u>Assignment of Error One</u>

Defense counsel provided constitutionally ineffective assistance by raising a mental state defense that inculpated [Ford] and revealed his multiple prior convictions for rapes to the jury, causing extreme prejudice.

<u>Assignment of Error Two</u>

The trial court erred in failing to grant defense counsel's motion for mistrial after the State cross-examined a witness regarding [Ford's] criminal record.

<u>Assignment of Error Three</u>

The trial court violated [Ford's] Sixth Amendment rights in failing to dismiss counts related to an alleged victim that did not appear in court to testify.

Assignment of Error Four

The trial court erred in allowing irrelevant testimony from [Dr.] Wolpaw and [Sergeant] Flaherty regarding the details of [W.W.'s] attack and attacker, which had far greater chance to be prejudicial than probative.

Assignment of Error Five

Insufficient evidence supported [Ford's] convictions as to W.W.

Assignment of Error Six

The manifest weight of the evidence did not support [Ford's] convictions as to W.W.

Ineffective Assistance of Counsel

{¶30} In the first assignment of error, Ford argues that defense counsel was ineffective for presenting the "psychosis defense," which Ford claims is not recognized in Ohio. Ford claims this defense prejudicially harmed him because his mental health history was introduced, which included his prior convictions.

{¶31} In order to establish ineffective assistance of counsel, Ford must demonstrate that: (1) counsel's performance fell below an objective standard of reasonable representation, and (2) he was prejudiced by that performance. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

{¶32} A review of the record in the instant case reveals that Ford sought to put his mental status before the jury. At a pretrial prior to when the trial was set to commence on October 17, 2016, Ford requested a continuance to further an opportunity to obtain medical records that would assist with his defense. The trial court initially indicated that it would not allow a continuance and indicated that trial would start as scheduled. Ford told the court that he did not want to participate in the trial if the trial court was not going to give him a   fair opportunity to present his case. Trial counsel renewed his request for a continuance.

{¶33} After further consideration, the trial court granted Ford's request and continued the trial to allow Ford to explore the condition of involuntary intoxication or some other medical condition that could have some impact. Ford was afforded an opportunity to retain another expert at the state's expense and was allowed the opportunity to put Dr. Layton on the stand. While on the stand, Dr. Layton testified that Ford suffered from "acute psychosis" and also testified that Ford had prior rape convictions. Dr. Layton's report, which was introduced into evidence, also referenced the convictions.

{¶34} By calling Dr. Layton as a defense witness, Ford was provided with the opportunity he requested — testimony that would assist with his defense. "'[A] reviewing court may not second-guess decisions of counsel that can be considered matters

of trial strategy. *State v. Smith* (1985), 17 Ohio St.3d 98, 17 477 N.E.2d 1128.'" *State v. Hines*, 8th Dist. Cuyahoga No. 90125, 2008-Ohio-4236, ¶ 21, quoting *State v. Baker*, 159 Ohio App.3d 462, 466, 2005-Ohio-45, 824 N.E.2d 162 (2d Dist.). Indeed, "'[d]ebatable strategic and tactical decisions may not form the basis of a claim of ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy was available.'" *Id.*, quoting *Baker*.

{¶35} Here, Ford fails to argue what would have happened had defense counsel decided to forego any expert testimony. Moreover, there was overwhelming evidence of Ford's guilt through the DNA evidence. Zielaskiewicz communicated her confidence in the DNA match with respect to K.H. with the odds of the DNA profile on the vaginal swabs and the anal swabs being someone other than Ford as "one in 12 quadrillion, 120 trillion unrelated individuals." Evelyth communicated her confidence in the DNA match with respect to A.W. with the odds of the DNA profile on the vaginal swabs and the anal swabs being someone other than Ford as "one in 12 quadrillion, 120 trillion unrelated individuals." Evelyth further testified that Ford could not be excluded as a contributor of the DNA from W.W.'s shirt and, based upon the database, the proportion of the population that could not be excluded is 1 in 1,441,000 unrelated individuals. Thus, we cannot say defense counsel was ineffective because the defense Ford wanted to pursue was unsuccessful.

{¶36} The first assignment of error is overruled

## Motion for Mistrial

**{¶37}** In the second assignment of error, Ford argues the trial court should have declared a mistrial after the state questioned Dr. Layton about Ford's previous rape convictions.

**{¶38}** "The decision whether to grant a mistrial rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." *State v. Rucker*, 8th Dist. Cuyahoga No. 105628, 2018-Ohio-1832, ¶ 18, citing *State v. Treesh*, 90 Ohio St.3d 460, 480, 2001-Ohio-4, 739 N.E.2d 749; Crim.R. 33. The granting of a mistrial is necessary only when a fair trial is no longer possible. *Id.*, citing *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

**{¶39}** In the instant case, Ford called only one witness to testify at trial — Dr. Layton. On direct examination, Dr. Layton testified extensively regarding his first evaluation of Ford in 2006. He further testified that he met with Ford eight times in connection with the instant case between December 2016 and a week prior to trial. Dr. Layton testified that his purpose in meeting with Ford was to understand Ford's mental state at the time of the rapes. Dr. Layton testified that he took a history from Ford, wherein Ford described his life in detail to Dr. Layton. Defense counsel asked Dr. Layton to describe the statements Ford made during his 2017 interviews. Dr. Layton even testified that he believed Ford's statements to him were trustworthy. Dr. Layton testified on direct examination that all of this information came directly from Ford's statements and the results of the previous tests he administered on Ford.

{¶40} Through Dr. Layton's testimony, Ford was essentially allowed to testify without taking the stand. Defense counsel elicited from Dr. Layton numerous and extensive statements made by Ford himself, on topics such as his childhood, his memories of the crimes committed in the instant case, and "the orchestrators" — the purported cause of his behavior. Defense counsel also elicited testimony from Dr. Layton that he believed Ford's statements.

{¶41} Thereafter, on cross-examination, the state sought to impeach Ford's statements under Evid.R. 806. Evid.R. 806 permits the impeachment of a declarant when the "hearsay statement, or a statement defined in Evid.R. 801(D)(2), (c), (d), or (e), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence that would be admissible for those purposes if declarant had testified as a witness." *Id.* at (A). In conjunction with Evid.R. 806, Evid.R. 609 allows the state to attack the credibility of a witness by evidence of a prior conviction for the purpose of impeaching that witness.

{¶42} In the instant case, at sidebar, the state reasoned that impeachment of Ford was proper because defense counsel had effectively elicited Ford's testimony through Dr. Layton. As a result, Ford's own credibility became relevant, especially since Dr. Layton testified he believed Ford. The trial court agreed with the state and allowed it to question Dr. Layton regarding whether he was aware that Ford had various convictions. Dr. Layton testified that he was not "specifically aware" of those convictions, despite

previously testifying that he prepared his 2006 report after Ford had been convicted of eight separate rapes.

**{¶43}** The trial court found that:

[Dr. Layton] through his direct testimony, did in effect tell the jury what [Ford] told him about his history, about his education, about his employment, about his childhood, many things, so in effect through Dr. Layton [Ford] was in fact testifying. He said he only knew about his education, childhood, et cetera, a good portion of it from that time line that [Ford] supplied to him. He read verbatim to the jury. So in effect since he, [Ford], testified through Dr. Layton, [the state] can then attempt to impeach [Ford] through Dr. Layton.

**{¶44}** We agree. Ford essentially testified without taking the stand and could be impeached. Ford's strategy was to introduce his excuses for his conduct. In light of the foregoing, we cannot say the trial court abused its discretion when it did not declare a mistrial after the state questioned Dr. Layton about Ford's prior rape convictions.

**{¶45}** Therefore, the second assignment of error is overruled.

## Confrontation Clause

**{¶46}** In the third assignment of error, Ford argues that his right under the Sixth Amendment to confront his witness was violated when the trial court did not dismiss the counts relating to W.W., who did not testify at trial. Ford challenges testimony from Dr. Wolpaw who treated W.W. and Sergeant Flaherty. Ford contends that the statements made by W.W. to Dr. Wolpaw and Sergeant Flaherty were testimonial and subject to the Confrontation Clause.

**{¶47}** The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the

witnesses against him * * *." The United States Supreme Court has interpreted this to mean that the admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{¶48} At issue in the instant case is whether W.W.'s statements contained in her medical records and her description of Ford were testimonial in nature and therefore inadmissible under the Sixth Amendment, or whether they were nontestimonial and admissible

{¶49} *Crawford* did not define the term "testimonial," but stated generally that the core class of statements implicated by the Confrontation Clause includes statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52.

{¶50} In *State v. Stahl*, 111 Ohio St.3d 186, 187, 2006-Ohio-5482, 855 N.E.2d 834, the Ohio Supreme Court considered whether hearsay statements by an adult rape victim to a nurse working in a specialized medical facility for sexual assault victims were admissible when the victim was not available to testify at trial. The court adopted the objective-witness test outlined in *Crawford* for out-of-court statements made to non-law-enforcement personnel, and concluded that in determining whether a statement is testimonial for Confrontation Clause purposes, courts should focus on the expectation of

the declarant when making the statement. *Id.* at paragraph two of the syllabus. Applying this objective-witness test, the *Stahl* court found that the victim's statements were made to a medical professional at a medical facility for the primary purpose of receiving medical treatment and not investigating past events related to criminal prosecution. *Id.* at ¶ 25. The court held that the statements made by the rape victim to the nurse were nontestimonial because the victim "could have reasonably believed that although the examination conducted at the [sexual assault] unit would result in scientific evidence being extracted for prosecution purposes, the statement would be used primarily for health-care purposes." *Id.* at ¶ 47.

{¶51} In *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 63, the Ohio Supreme Court held that the statements of a child victim of sexual assault made to doctors and counselors about how her father had sexually abused her were not testimonial and were admissible because they had been made to medical personnel in the course of medical diagnosis and treatment. The *Muttart* court held that "[s]tatements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under *Crawford*, because they are not even remotely related to the evils that the Confrontation Clause was designed to avoid." *Id.* The court also noted that "[t]he fact that the information gathered by the medical personnel in this case was subsequently used by the state does not change the fact that the statements were not made for the state's use." *Id.* at ¶ 62. *See also State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933

N.E.2d 775, ¶ 41 ("Statements made for medical diagnosis and treatment are nontestimonial.").

**{¶52}** In this case, just as in *Stahl* and *Muttart*, the testimony of Dr. Wolpaw was admissible. Dr. Wolpaw's primary purpose in speaking with W.W. was for treatment and diagnosis. Dr. Wolpaw testified that she took a history from W.W. to inform her treatment of W.W. and to prepare W.W. The statements made by W.W. were in response to questions by Dr. Wolpaw for the purposes of informing her treatment and preparing her patient. W.W. stated that she was followed by a man, later identified as Ford, into the restroom who told her that he wanted to have sex with her and that if she refused he would hurt her and kill her. W.W. fought with Ford and he hit her in the head, nose, neck, right eye and stomach.

**{¶53}** A patient's statements concerning how the alleged rape occurred can be relevant to show the "general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4). W.W.'s statements about her rape were relevant for medical diagnosis and treatment because they guided medical personnel to the particular area(s) of the her body to be examined for injury, as well as indicate which areas may need more immediate treatment than others. *State v. Bowleg*, 8th Dist. Cuyahoga Nos. 100263 and 100264, 2014-Ohio-1433, ¶ 19, citing *State v. Wallace*, 3d Dist. Union No. 14-10-20, 2011-Ohio-1728, citing *State v. Menton*, 7th Dist. Mahoning No. 07 MA 70, 2009-Ohio-4640, ¶ 51

> ("the description of how the [sexual] assault took place, over how long of a period, how many times a person was hit, choked or penetrated, and what types of objects were inserted are all specifically relevant to medical treatment. They are part of the medical history. They are the reason for the symptoms. They let the examiner know where to examine and what types of injuries could be latent.")

**{¶54}** Accordingly, we find that the statements made by W.W. to Dr. Wolpaw are not testimonial because an objective witness under the same circumstances would not

have reasonably believed that her statements would be used later for trial.  Indeed, "questioning by a nurse or other medical professional during an emergency-room examination would appear to serve a primarily health-care-related function."  *Stahl* at ¶ 47.

{¶55} With regard to Sergeant Flaherty's testimony, we note that his testimony was as to his involvement in the case.  He stated that when he arrived on scene, he already had a description of a potential suspect.  A suspect search was then conducted.  He also learned that W.W. was a student at CSU at the time of the incident.  Sergeant Flaherty's testimony discussed his involvement of the case, his testimony was not hearsay, and therefore, it does not violate the Confrontation Clause.

{¶56} Accordingly, the third assignment of error is overruled.

### Prejudicial Testimony

{¶57} In the fourth assignment of error, Ford argues that the hearsay statements by W.W. to Dr. Wolpaw and the police were highly prejudicial and inadmissible under Evid.R. 403(A), which mandates the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶58} We note that appellate courts review a trial court's decision regarding the admission of any evidence under an abuse of discretion standard.  *State v. Norton*, 8th Dist. Cuyahoga No. 102017, 2015-Ohio-2516, ¶ 19, citing *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

**{¶59}** In the instant case, Ford does not argue how the trial court abused its discretion in allowing Dr. Wolpaw's testimony or the testimony of the police. As discussed above, Dr. Wolpaw's testimony was proper under Evid.R. 803(4). The testimony was used to show the treatment of W.W. Additionally, with regard to Sergeant Flaherty's testimony, his statements were not offered for the truth of the matter asserted, but were offered to explain the investigation. Therefore, the trial court did not abuse its discretion in allowing this evidence to be admitted at trial.

**{¶60}** Accordingly, the fourth assignment of error is overruled.

<u>Sufficiency of the Evidence — W.W.</u>

**{¶61}** In the fifth assignment of error, Ford argues the state presented insufficient evidence to support the convictions involving W.W. because she did not testify at trial.

**{¶62}** The Ohio Supreme Court in *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113, explained the standard for sufficiency of the evidence as follows:

> Raising the question of whether the evidence is legally sufficient to support
>
> the jury verdict as a matter of law invokes a due process concern. *State v.*
>
> *Thompkins* (1997), 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.
>
> In reviewing such a challenge, "[t]he relevant inquiry is whether, after
>
> viewing the evidence in a light most favorable to the prosecution, any
>
> rational trier of fact could have found the essential elements of the crime
>
> proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d

259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

**{¶63}** We are mindful that, in considering the sufficiency of evidence, a certain perspective is required. *State v. Eley*, 56 Ohio St.2d 169, 172, 383 N.E.2d 132 (1978). "This court's examination of the record at trial is limited to a determination of whether there was evidence presented, 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *Id.*, quoting *Atkins v. State*, 115 Ohio St. 542, 546, 155 N.E. 189 (1926). It is the minds of the jurors, rather than a reviewing court, that must be convinced. *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982).

**{¶64}** Ford states that he incorporates "the fact and law regarding *Crawford*" and argues that there was insufficient evidence that Ford was the perpetrator. Our review of the evidence reveals otherwise. W.W.'s statements to the police and Dr. Wolpaw and the photographic evidence of her injuries indicate that she was beaten and raped. Furthermore, the DNA evidence collected during her sexual assault examination matched Ford's DNA. This evidence, when viewed in a light most favorable to the state, is sufficient to sustain Ford's convictions relating to W.W. *See State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 30-35 (where this court considered the medical record evidence of a sexual assault victim in rejecting the defendant's claim that there was insufficient evidence to convict the defendant.)

**{¶65}** Thus, the fifth assignment of error is overruled.

## Manifest Weight of the Evidence — W.W.

**{¶66}** In the sixth assignment of error, Ford argues his convictions, as they relate to W.W., are against the manifest weight of the evidence.

**{¶67}** In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 390, 1997-Ohio-52, 678 N.E.2d 541. The Ohio Supreme Court in *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, stated:

> [T]he reviewing court asks whose evidence is more persuasive — the state's or the defendant's? * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." [*Thompkins* at 387], citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

**{¶68}** Moreover, an appellate court may not merely substitute its view for that of the jury, but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶69} Ford contends that he was deprived of the opportunity to impeach W.W.'s credibility because she did not testify at trial. We find his argument unpersuasive. As stated above, the jury heard that W.W. was followed by Ford into the restroom and then brutally raped. The DNA evidence in the sexual assault kit matched Ford's DNA. Based on this evidence, we cannot say that the "jury lost its way" and this is the exceptional case in which the evidence weighs heavily against the conviction.

{¶70} Accordingly, the sixth assignment of error is overruled.

{¶71} Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
FRANK D. CELEBREZZE, JR., J., CONCUR