[Cite as *State v. Wingfield*, 2019-Ohio-1644.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 107196**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DANIEL WINGFIELD

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-601476-D

**BEFORE:** Sheehan, J., E.T. Gallagher, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** May 2, 2019

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
2077 East Fourth Street, 2nd Floor
Cleveland, OH 44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Geoffrey S. Minter
Anna M. Faraglia
Katherine Mullin
Brian Radigan
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH   44113

MICHELLE J. SHEEHAN, J.:

{¶1} Defendant-appellant Daniel Wingfield appeals from his conviction for aggravated murder, murder, attempted murder, felonious assault, and having weapons while under disability.   For the reasons that follow, we affirm.

## I.   Procedural History

{¶2} On December 3, 2015, Wingfield was charged along with three codefendants in a multiple-count indictment:   Count 1 — aggravated murder (of Dexter Mangham) in violation of R.C. 2903.01(A); Count 2 — murder (Mangham) in violation of R.C. 2903.02(B); Count 3 — felonious assault (Mangham) in violation of R.C. 2903.11(A)(1);   Count 4 — felonious assault (Mangham) in violation of R.C. 2903.11(A)(2); Count 5 — attempted murder (of Alfonzo Jones) in violation of R.C. 2923.02/2903.02(A);   Count 6 — felonious assault (Jones) in violation of R.C. 2903.11(A)(1); Count 7 — felonious assault (Jones) in violation of R.C. 2903.11(A)(2); Count 8 — attempted murder (of Jami N. Russell) in violation of R.C. 2923.02/2903.02(A); Count 9 — felonious assault (Russell) in violation of R.C. 2903.11(A)(1); Count 10 — felonious assault (Russell) in violation of R.C. 2903.11(A)(2); Count 11 — attempted murder (of Pierre R. Williams) in violation of R.C. 2923.02/2903.02(A); Count 12 — felonious assault (Williams) in violation of R.C. 2903.11(A)(1); Count 13 — felonious assault (Williams) in violation of R.C. 2903.11(A)(2); and Count 15 — having weapons while under disability in violation of

R.C. 2923.13(A)(3).[1]   The indictment stems from a shooting that occurred on September 27, 2015, in the area of E. 4th Street and Euclid Avenue, Cleveland, Ohio.

{¶3}   Wingfield waived his right to a jury trial, and the bench trial commenced on March 13, 2018.   At the close of the state's evidence, Wingfield moved for Crim.R. 29 acquittal, and the state requested the court consider the theory of aiding and abetting. The court denied Wingfield's motion for acquittal and found him guilty on all counts.

{¶4}   On April 19, 2018, the court held a sentencing hearing.   The court merged Counts 1 through 4, and the state elected the court to sentence on Count 1; Counts 5 through 7, and the state elected the court to sentence on Count 5; Counts 8 through 10, and the state elected the court to sentence on Count 8; and Counts 11 through 13, and the state elected the court to sentence on Count 11.   The court then imposed the following sentence:   Count 1 — 25 years to life in prison, plus an additional mandatory consecutive 3 years on the firearm specification; Counts 5, 8, and 11 — 5 years in prison on each count, plus an additional 3 years on the firearm specifications, consecutive to serving the 5 years on each sentence; and Count 15 — 18 months in prison.   The court ordered all sentences to be served consecutively and made the findings under R.C. 2929.14(C)(4).   The total prison sentence imposed was 53 ½ years.

{¶5} Wingfield appealed his conviction and assigned the following errors for our review:

---

[1]   Count 14 pertains only to a codefendant.

I. The trial court denied Appellant his right to due process under the United States and Ohio Constitutions, Confrontation Clause, and abused its discretion under Ohio law when it allowed a police officer to provide hearsay, identification testimony to prove the truth of the matter asserted.

II. The state presented insufficient evidence of Appellant's guilt of any indicted offense under either state law or measured by federal protections of due process.

III. The manifest weight of the evidence did not support a conviction of Appellant.

## II. Trial

{¶6} Cleveland Police Officer Robert O'Brien testified that he was on routine patrol in downtown Cleveland in the early morning hours of September 7, 2015, when he received a call about shots being fired in the area of East Fourth Street and Euclid Avenue. Responding to the scene, Officer O'Brien observed "many people running around" and an unresponsive male lying on the ground at the corner of East Fourth and Euclid. Multiple officers were on the scene. The officer testified that "a lot of people" were exiting the Bank Nightclub on Euclid Avenue. Officer O'Brien also observed a female in the same area of East Fourth and Euclid with a gunshot wound to her left leg. She was later identified as Jami Russell. The officer spoke with this victim, gathered information from her, made a report, and then cordoned off the area in order to preserve the scene.

{¶7} Officer Darian Laska also responded to a call of shots fired near the Bank Nightclub. While on the way to East Fourth and Euclid, Officer Laska received updated information of possible suspects heading down East Fourth Street. The officer testified

that he and his partner headed to East Fourth and Prospect Avenue, where he observed people running. He stated that he heard from people shouting that someone had been shot. Officer Laska then observed a male, who had been shot in his left calf, "almost hiding under a pickup truck." This individual was later identified as Pierre Williams. Officer Laska and his partner assisted the victim, gathered some information from the victim while attempting to calm him down, and then proceeded to walk up and down East Fourth Street looking for a weapon. They were unsuccessful in finding one.

{¶8} Detective Stephen McGrath was working the night shift as a patrol officer when he responded to St. Vincent Charity Hospital for a report of a male with a gunshot wound to his right leg. Detective McGrath identified the victim as Alfonzo Jones. The detective testified that the victim was not forthcoming with information, but he eventually revealed that he had been at a downtown bar, and he offered "a very vague description of a suspect."

{¶9} Martize Hollowell was with his childhood friend, Dexter Mangham, at the Bank Nightclub on September 27, 2015. He testified that when he was inside the club, a fight broke out, and he ran outside. He thought Mangham was right behind him. While Hollowell was running down Euclid Avenue, he saw that a male who was running behind him got shot in the leg. Hollowell flagged someone down to assist the male.

{¶10} Hollowell stated that he did not know at this point where Mangham was. Hollowell testified that he heard a lot of shots but did not see who fired the shots because he "didn't look back." Hollowell testified that he kept running until the police found

him, placed him in a patrol car, and brought him back to the club. When the police informed him that Mangham was shot in the head, he cried.

{¶11} Hollowell was taken to the police station downtown where he gave his statement to a detective. After speaking with the police, Hollowell returned to his mother's house to find police officers there. Hollowell stated that there was "big damage" done to the home, including a window being shot out. He did not know why his mother's house would have been damaged in that way.

{¶12} Detective Raymond Diaz received a text message from dispatch at approximately 2:30 a.m. on September 27, 2015, with a report of a male who was the victim of a gunshot wound.

{¶13} Responding to the scene, the detective began to assist the crime scene unit with collecting evidence. He learned at this time that there were multiple gunshot victims, three of whom were shot in the leg and one male who was shot in the head and had died. Detective Diaz testified that in the course of his investigation, he spoke with each of the surviving victims regarding their injuries.

{¶14} While on the scene, Detective Diaz observed broken glass, blood, articles of clothing, bullet holes, and a window of the Cleveland Sports Commission on Euclid Avenue that had been shot out. The detectives recovered two .380 caliber spent shell casings and three 9 mm spent shell casings from the roadway in front of the Sports Commission.

{¶15} The detectives returned to the scene the next day in order to search for additional evidence in the daylight. At this time, the detectives discovered additional "defects" in the interior of the Sports Commission, along with a deformed pellet, which they removed from a wall inside the office.

{¶16} The detectives also recovered video surveillance from the Sports Commission (State exhibit No. 300). The video, consisting of two camera views (channel 4 and channel 6), captured individuals on the street and events that occurred on Euclid Avenue in front of the Sports Commission.

{¶17} Detective Diaz explained that he had reviewed the Sports Commission videos and, based upon his investigation, including witness interviews, he was able to determine the four individuals that approached and entered a vehicle around the time of the shooting. The detective testified that his investigation allowed him to also identify Hollowell and Mangham in the video. He further testified regarding the video surveillance, describing the events as they unfolded.

{¶18} Detective Diaz's review of the video surveillance revealed a Maserati pulling into a parking space on Euclid Avenue in front of the Sports Commission. Detective Diaz learned through his investigation that the owner of the Maserati is Maurice Preston, whom the detectives interviewed but who had refused to testify in this case. A Camry pulls in behind the Maserati. Four individuals exit the Maserati and four individuals exit the Camry. All eight individuals walk together westbound on Euclid Avenue toward the Bank Nightclub. Some time passes, and the individuals that

Detective Diaz identified as Devon Drake, Dontez Drake, Christopher Smith, and Wingfield return to the Camry. Dontez Drake gets into the front driver's side of the vehicle. Christopher Smith, whom the detective identifies as the individual dressed in all white, walks directly behind Dontez Drake. Devon Drake gets into the front passenger's side of the vehicle, and Wingfield gets into the back passenger's side of the vehicle. They all remain in the vehicle for approximately 45 minutes. Then Wingfield exits the rear passenger's side and walks westbound on Euclid toward the Bank Nightclub, out of the camera's view. He returns to view approximately one minute later and gets back into the rear passenger seat of the Camry. None of the other occupants leave the vehicle.

{¶19} Approximately ten minutes after Wingfield returns to the vehicle, three individuals are seen on the video running eastbound on Euclid Avenue, and as the detective states, "everything happens fast here." One individual stops, begins to walk back, westward on Euclid Avenue. The Camry's brake lights light up, the Camry begins to back up, and a flash appears, coming from the direction of the Camry. Mangham and Hollowell are seen running east on Euclid Avenue, and the Camry starts to pull forward. Mangham then falls to the ground. As the Camry continues to pull forward, flashes "from a gun being fired in [Mangham's] direction" come from the Camry.

{¶20} Detective Diaz also testified that during the course of his investigation, he learned about an incident that occurred at the Bank Nightclub. And based upon that

information, the detectives obtained a search warrant for the club. Upon searching the interior of the premises, police discovered a bottle near suspected blood on the ground.

{¶21} Detective Diaz further testified regarding the spent shell casings recovered in the street directly in front of the Sports Commission. He stated that there were two separate sets of casings, which would indicate that there were at least two firearms used in this incident. He testified that the location of the casings indicate the casings were likely fired from the Camry that is seen in the video in front of the Sports Commission.

{¶22} Additionally, Detective Diaz learned that the car in the video, a 2015 Toyota Camry, had been rented by Lakita Drake from Enterprise Rent-a-Car on September 14, 2015, at 5:14 p.m. and returned on September 28, 2015, at 4:20 p.m. Detective Diaz testified that upon locating the Camry, on October 21, 2015, the detectives examined the inside of the vehicle for any defects possibly related to the shooting and collected samples for any gunshot residue. The detectives learned that the Camry had been cleaned, re-rented, and returned to Enterprise by the time they had located and examined the vehicle. The detectives did not discover any defects, and because they learned the vehicle had been cleaned and re-rented, it was never tested for gunshot residue.

{¶23} Detective Diaz testified that based upon information gathered during his investigation, all of the suspects were eventually located, interviewed, and arrested. Wingfield was apprehended on October 18, 2015, by a fugitive task force in Akron.

{¶24} Dr. Joseph Felo, from the Cuyahoga County medical examiner's office, concluded that Mangham suffered multiple gunshot wounds, including one in his hip and one through his lower left leg, and a fatal gunshot wound to the head.

{¶25} Kristin Koeth, the firearms examiner, testified that she received two morgue pellets and five spent shell casings for examination. Upon testing, Koeth determined that the two .380 shell casings were fired by a Taurus .380 caliber pistol. She testified that one of the morgue pellets was fired by this handgun. She stated that the second morgue pellet was also consistent with .380 ammunition but was too damaged to correlate it with any other bullet. Koeth further testified that the remaining three casings, the 9 mm Luger cartridge cases, were all fired by the same unknown 9 mm Glock handgun. Finally, Koeth stated that a Ruger 9 mm caliber pistol from another case was submitted in this case for comparison purposes. Koeth concluded that the Ruger 9 mm caliber pistol did not fire any of the submitted evidence related to Mangham's death.

{¶26} Sergeant Phillip Christopher, corrections sergeant with the Cuyahoga County Sheriff's Department, is in charge of jail investigation and inmate visitation. Sergeant Christopher identified phone calls placed by Wingfield from jail (State's exhibit Nos. 305-307). These phone calls were played for the court:

Appellant:  If them n'gas stay cool, then n'ga don't — don't say nothing, then n'gas cool.

Appellant:  They got a statement and they got a video with a spark coming out of the window, but it doesn't show nobody with no gun. They trying to convict all of us off a spark. Some n'ga post some statements saying he did this he did that so how they think some n'gas know something.

Caller:     Who do you think they are going to charge?

Appellant:     Man listen. Man.   They trying to charge whoever window it was.

* * *

Appellant:     Yeah, that's what I told these n'gas.   But you see what I'm saying * * * I talked to Woody the other day; me and Woody going to trial.

Caller:     So what are you going to do?

Appellant:     I'm going to trial.   They aren't offering me no plea or nothing.

* * *

Appellant:     That n'ga said that me and Woody were shooting. * * * And then Woody and D said me and Chris were shooting.

* * *

Appellant:     Them n'gas D and Woody * * * tell them * * * them n'gas don't do shit.   They tryin' to put it on me and Chris * * * and this bitch ass n'ga Chris tryin' to put it on me and Woody.

Appellant:     See what it is, they trying to make it seem like they ain't got shit to do with shit.   You feel me.   They go see the homicide people and say like, me and my brother ain't got nothing to do with this da da da it was them two.

* * *

Caller:     How did they even pick you up?

Appellant:     Them n'gas, you know how when you go see the homicide people and they ask you who was in the car, them n'gas put my name down, man.   So then that's when they put the warrant out for me.

* * *

Appellant:      My lawyer says well the fight is they got to prove that I had a gun.

* * *

Appellant:      All they got is of me getting in a car on the

video.   I can get in a car, what the f***

n'ga it's a club, I'm leaving the club, you

feel me?

### III.   Police Testimony

**{¶27}** In his first assignment of error, Wingfield contends that the court erred in admitting the testimony of Detective Diaz.   Specifically, he contends that the detective's testimony regarding the identification of the defendant in video surveillance footage of the crime scene was hearsay, improper opinion testimony, and a violation of the Confrontation Clause.

### A.   Hearsay

**{¶28}** Wingfield argues that Detective Diaz's testimony identifying him (and his codefendants) in the video surveillance is inadmissible hearsay.

**{¶29}** A trial court has broad discretion regarding the admission of evidence, including whether evidence constitutes hearsay and whether it is admissible hearsay. *Solon v. Woods*, 8th Dist. Cuyahoga No. 100916, 2014-Ohio-5425, ¶ 10.   We therefore will not disturb a trial court's decision regarding the admissibility of hearsay evidence absent an abuse of discretion and the defendant suffers material prejudice.   *Id.*, citing *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984).

{¶30} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). If either element is missing — (1) a statement or (2) offered for its truth — the testimony is not hearsay. *State v. Holt*, 9th Dist. Lorain No. 97CA006985, 1999 Ohio App. LEXIS 4149, 8 (Sept. 8, 1996), citing *Maurer* at 262.

{¶31} A "statement" is (1) an oral or written assertion or (2) nonverbal conduct intended to be an assertion. Evid.R. 801(A). For hearsay purposes, an "assertion" is "a statement about an event that happened or a condition that existed." *State v. Wellman*, 10th Dist. Franklin No. 05AP-386, 2006-Ohio-3808, ¶ 14, citing *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 61; *State v. Carter*, 72 Ohio St.3d 545, 549, 1995-Ohio-104, 651 N.E.2d 965, quoting 2 McCormick, *Evidence,* Section 246, at 98 (4th Ed.1992), ("An 'assertion' for hearsay purposes 'simply means to say that something is so, e.g., that an event happened or that a condition existed.'").

{¶32} There is no "statement" for hearsay purposes where a witness does not testify about "what someone else said, wrote, or did." *State v. Maiolo*, 2d Dist. Clark No. 2015-CA-15, 2015-Ohio-4788, ¶ 14, citing Evid.R. 801(A) (defining a statement for hearsay purposes); *see State v. Wilson*, 8th Dist. Cuyahoga No. 92148, 2010-Ohio-550, ¶ 24 (finding detective's testimony regarding what he learned during his investigation into a phone number not a statement and therefore not hearsay); *State v. Tibbs*, 8th Dist. Cuyahoga No. 89723, 2008-Ohio-1258, ¶ 11 (finding officer's testimony regarding what he observed on a piece of evidence not a "statement" within the hearsay rule); *State v.*

*Carruth*, 2d Dist. Montgomery No. 19997, 2004-Ohio-2317, ¶ 57 (finding officer's testimony regarding what he learned during his investigation into a remote control device found on the defendant not a statement for hearsay purposes); *State v. Neal*, 2d Dist. Champaign Nos. 2000 CA 16 and 2000 CA 18, 2002-Ohio-6786, ¶ 51 (finding no hearsay where sheriff testified regarding what he learned as a result of his investigation and related no statement made to him concerning the testimony); *see also State v. Bailey*, 8th Dist. Cuyahoga No. 97330, 2012-Ohio-3356, ¶ 29 (finding the detective's testimony implicating what a witness reported provided context to events leading up to an arrest, did not include what the witness told him, and was not hearsay).

{¶33} The historic purpose of the hearsay rule is "to exclude statements of dubious reliability that cannot be tested by cross-examination." *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 70; *State v. Armstead*, 85 Ohio App.3d 247, 253, 619 N.E.2d 513 (3d Dist.1993), quoting *Mikula v. Balogh*, 9 Ohio App.2d 250, 224 N.E.2d 148 (2d Dist.1965) ("[T]he rule prohibiting hearsay evidence is based upon 'unreliability of such evidence and the impossibility of cross-examination.'"). Hearsay is generally inadmissible unless an exception applies. Evid.R. 802.

{¶34} Detective Diaz took the stand and explained his investigation, stating that he returned to the scene of the crime the same day to recover any video evidence. He testified that he recovered video surveillance from the Sports Commission and viewed every section of the video footage that consisted of two camera angles. Thereafter, over defense counsel's objections, the following exchange occurred:

State: Through the course of your investigation, did you bring some witnesses in?

Detective: Yes, Ma'am.

State: Were you able to determine who was in this car (in the video)?

Detective: Yes. I was able to identify four individuals who got into that vehicle.

State: * * * and who were those individuals?

Detective: I learned it to be Devon Drake, Dontez Drake, Christopher Smith, and Daniel Wingfield.

{¶35} The detective stated that as a result of reviewing the video surveillance, they obtained warrants for all four suspects who were all eventually arrested. The prosecutor then played the video for the court as the detective explained the footage:

At 00:43:56 you're going to see the rear taillights of the Toyota [Camry] then light up. There you see them light up from a key fob being hit. And then at 00:44 you're going to see Devon Drake, Dontez Drake, Christopher Smith, and Daniel Wingfield all approaching the car.

* * *

Dontez Drake is now going to walk on the driver's side and go to the front driver's side of the vehicle. Christopher Smith, who is in all white, walks directly behind him. Devon Drake, who's the male right here (pointing at the video screen), he goes up to the front passenger seat. And then this male was identified as Daniel Wingfield, gets in the rear passenger seat. He steps off the curb and into the rear passenger door.

**{¶36}** After having watched the video, hearing testimony from other witnesses, and listening to the recorded   jailhouse phone calls, the prosecutor re-called Detective Diaz, and the following testimony was presented over defense counsel's objection:

State: * * * You testified about the fact that there [were] four individuals that were in the car at the time of the shooting, correct?

Detective: Correct.

State: All right.   During the course of your investigation, did you learn who those four individuals were?

Detective: We did.

* * *

State: Based on information that you learned, did you gain information that allowed you to make determinations of where Devon Drake was sitting in the car?

Detective: We were. Yes.

State:  Okay.   And based on the information that you had, where was Devon Drake sitting?

Detective: * * * Devon Drake was seated in the front passenger seat.

State:  Okay.   And based on information that you gained about * * * Dontez Drake, did you gain information about where you believed he was sitting?

Detective: Dontez Drake was the driver of the vehicle.

State: Okay.   And likewise, * * * during the course of your investigation, were you able to make a determination as to where Christopher Smith was sitting?

Detective: Yes.

State: Okay. And what about watching the video allowed you to make a determination about where Christopher Smith was sitting?

Detective: Christopher Smith was seated in the driver's side rear door based on his clothing * * * He had white clothing on. And he had recently been shot, so he was walking with a limp.

State: * * * you've indicated that based on the video and the course of your investigation you learned that there were four individuals in that car, correct?

Detective: Correct.

**{¶37}** Based upon their investigation, the police made a determination as to who was in the car, as testified above, and they arrested Wingfield and his three codefendants.

**{¶38}** We find the above exchange did not contain hearsay. Detective Diaz at no time during the line of questioning testified regarding an out-of-court statement. He did not testify regarding an event that happened or a condition that existed. Nor did he testify about what someone said, wrote, or did. Rather, the detective's testimony related to his investigation into the shooting, providing context to the events leading to the suspects' arrest. And because this case was tried to the court, we presume, unless affirmatively shown otherwise, that the court considered the detective's testimony for proper purposes. *State v. Colegrove*, 8th Dist. Cuyahoga No. 102173, 2015-Ohio-3476, ¶ 22.

**{¶39}** In addition, even if we find that the detective's identification of Wingfield in the car included a statement, that statement was not offered for the truth of the matter asserted. Rather, Wingfield admitted to being in the car at the scene of the shooting (through his recorded jailhouse phone calls). The detective's testimony identifying

Wingfield as one of the individuals in the car that night was merely cumulative and not offered for the truth of the matter asserted. *State v. Taylor*, 8th Dist. Cuyahoga No. 101704, 2015-Ohio-2513, ¶ 47-48. Wingfield specifically stated in the recorded jailhouse call:

> Appellant: All they got is of me getting in car on the video. I can get in a
>
> car, what the f*** n'ga it's a club, I'm leaving the club, you feel me?

Therefore, the detective's statement regarding Wingfield in the vehicle in the video surveillance is not hearsay. Because the case was tried to the court and there is no evidence in the record that the court considered the detective's statement for an otherwise improper purpose, we presume the court considered the detective's identification statement for proper purposes. *See Colegrove*.

**{¶40}** Thus, Wingfield's argument that the trial court abused its discretion by allowing Detective Diaz's identification of Wingfield in the video surveillance is overruled.

## B. Opinion Testimony

**{¶41}** Wingfield argues that Detective Diaz offered improper opinion testimony regarding the identification of the individuals depicted in the video surveillance. In support, he states that a law enforcement officer may not offer an opinion on a defendant's guilt or comment on his or her credibility.

**{¶42}** Detective Diaz testified as a lay witness. Therefore, the admissibility of his testimony as purported opinion testimony is analyzed under Evid.R. 701. *See State v.*

*Walker-Curry*, 8th Dist. Cuyahoga No. 106228, 2019-Ohio-147, ¶ 12. Evid.R. 701 provides that if a witness is not testifying as an expert, "the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *Id.*; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 119.

**{¶43}** The challenged testimony, however, does not include any improper opinion testimony. Specifically, Detective Diaz never offered his personal opinion on who was in the car seen in the video surveillance. He did not comment on Wingfield's guilt or question anyone's credibility. Rather, the detective's testimony was based upon information he gleaned from his investigation of the shooting. After conducting his investigation, he testified regarding the content of the surveillance video. The detective's testimony regarding Wingfield and his codefendants is therefore not improper opinion testimony.

## C. The Confrontation Clause

**{¶44}** Wingfield argues that Detective Diaz's testimony violated his constitutional right to confrontation.

**{¶45}** The Confrontation Clause of the Sixth Amendment to the United States Constitution preserves the right of a criminal defendant "to be confronted with the witnesses against him." *State v. Johnson*, 2018-Ohio-1389, 110 N.E.3d 800, ¶ 33 (8th Dist.). The Confrontation Clause bars the admission of "testimonial hearsay" unless the

declarant is unavailable and the accused had a prior opportunity to cross-examine the declarant. *Id.*, citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**{¶46}** Where there is no hearsay, the testimony does not violate the Confrontation Clause. *State v. Ford*, 8th Dist. Cuyahoga No. 105865, 2018-Ohio-3563, ¶ 55 (sergeant's testimony concerning his involvement in the case was not hearsay and therefore did not implicate the Confrontation Clause); *Bailey*, 8th Dist. Cuyahoga No. 97330, 2012-Ohio-3356, at ¶ 30-31 (detective's testimony implicating what an informant reported was not hearsay and therefore did not implicate the Confrontation Clause). Indeed, "[s]tatements that are not hearsay are not implicated by the Confrontation Clause because they are not testimonial in nature. *State v. Waddell*, 3d Dist. Marion Nos. 9-04-30, 9-04-31, and 9-04-32, 2005-Ohio-1426, ¶ 7, citing *Crawford*.

**{¶47}** Here, we found that Detective Diaz's testimony regarding his identification of Wingfield in the video surveillance was not hearsay evidence. We therefore find that the detective's testimony does not implicate the Confrontation Clause.

**{¶48}** For these reasons, Wingfield's first assignment of error is overruled.

#### IV. Sufficiency of the Evidence

**{¶49}** In his second assignment of error, Wingfield contends that the state provided insufficient evidence to support his convictions relating to all four victims. Specifically, he challenges the state's evidence of identification, an overt act amounting to aiding and abetting, and prior calculation and design.

{¶50} When assessing a challenge to the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541.

{¶51} It is well established that the elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence, on the other hand, is evidence that requires "the drawing of inferences that are reasonably permitted by the evidence." *Id.* *See also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("[c]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind").

{¶52} Circumstantial and direct evidence are of equal evidentiary value. *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12. "Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence." *Cassano* at ¶ 13, citing *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). In some cases, circumstantial evidence may be "'more certain, satisfying and persuasive than direct evidence.'" *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶53} Circumstantial evidence is sufficient to establish the identity of the accused as the person who committed the crime. *In re A.W.*, 8th Dist. Cuyahoga No. 103269, 2016-Ohio-7297, at ¶ 28, citing *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11. And "[a] conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-155, 529 N.E.2d 1236 (1988).

### A.    Identification

{¶54} Wingfield contends that the state failed to provide sufficient evidence of the shooter's identification. Specifically, he argues that the video surveillance was not clear enough to identify an individual by his face and Detective Diaz's testimony did not add anything to the video because he could not clearly see the shooter or shooters.

{¶55} However, Wingfield admits in a jailhouse phone call that he was in the car at the scene, stating, "All they got is of me getting in a car on the video. I can get in a

car, what the f*** n'ga it's a club, I'm leaving the club, you feel me?" Indeed, defense counsel conceded during closing arguments that his client made phone calls that placed him there.

**{¶56}** Detective Diaz admitted he could not see inside the vehicle's windows, nor could he identify the individuals by their faces. However, the detective testified that based upon his investigation, the surveillance video reflects gunshots from the same vehicle Wingfield admits he was in at the time of the shooting. The clothing the men wore and a limp with which one suspect walked, further enabled the detective to testify regarding the four individuals on the video getting into the Camry, including Dontez Drake and Devon Drake in the front seats and Christopher Smith and Wingfield in the rear seats.

**{¶57}** From this record, viewing the evidence in a light most favorable to the prosecution, we find that a reasonable factfinder could find the state presented sufficient evidence of identification.

### B. Prior Calculation and Design and Complicity

**{¶58}** Wingfield claims that the state presented insufficient evidence of prior calculation and design and of his complicity in the aggravated murder.

**{¶59}** Wingfield was convicted of aggravated murder in violation of R.C. 2903.01(A), which provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." The state must prove both "purpose" and "prior calculation and design" to support a conviction for aggravated

murder under R.C. 2903.01. *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, syllabus; *State v. Lash*, 8th Dist. Cuyahoga No. 104310, 2017-Ohio-4065, ¶ 35.

{¶60} A person acts purposely when it is his specific intent to cause a certain result. R.C. 2901.22(A).

{¶61} "'"[P]rior calculation and design"' indicates "'an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim."'" *Lash* at ¶ 36, quoting *Walker* at ¶ 17, quoting Ohio Legislative Service Commission, Proposed Ohio Criminal Code: Final Report of the Technical Committee to Study Ohio Criminal Laws and Procedures, at 71 (1971). "Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *Walker* at ¶ 18. The scheme must be "designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978).

{¶62} There is no bright-line rule to establish the existence of prior calculation and design; rather, the presence or absence of this element is determined on a case-by-case analysis of the facts and the evidence. *State v. Shine*, 2018-Ohio-1972, 113 N.E.3d 160, ¶ 149 (8th Dist.), citing *Walker,* 150 Ohio St.3d 409, 2016-Ohio-8295, at ¶ 19. The facts of a particular case can demonstrate that the defendant had adopted a plan to kill. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 46.

**{¶63}** In determining whether a defendant acted with prior calculation and design, the Ohio Supreme Court has delineated three factors a court should consider: "(1) Did the accused and victim know each other, and if so, was that relationship strained; (2) Did the accused give thought or preparation to choosing the murder weapon or murder site; and (3) Was the act drawn out or 'an almost spontaneous eruption of events?'" *Walker* at ¶ 20, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 1997-Ohio-243, 676 N.E.2d 82, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976); *Shine* at ¶ 149. These factors "must be weighed together and viewed under the totality of all circumstances of the homicide." *Jenkins* at 102.

**{¶64}** Circumstantial evidence from which a jury could conclude a defendant acted with prior calculation and design include:

> (1) evidence of a preconceived plan leading up to the murder, (2) evidence of the perpetrator's encounter with the victim, including evidence necessary to infer the defendant had a preconceived notion to kill regardless of how the [crime] unfolded, or (3) evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill.

*State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 75, citing *State v. Dunford*, 11th Dist. Ashtabula No. 2009-A-0027, 2010-Ohio-1272, ¶ 53; *see State v. Williams*, 8th Dist. Cuyahoga No. 106484, 2018-Ohio-3792, ¶ 39 (finding sufficient evidence of prior calculation and design where the defendant showed a remarkable change in demeanor upon seeing the victim, then immediately left the bar upon seeing the victim, and laid in wait for him); *State v. Moton*, 2018-Ohio-737, 107 N.E.3d 203, ¶ 10 (8th Dist.) (finding sufficient evidence of prior calculation and design where video

surveillance showed the defendant drove around the area where the murder occurred "as though waiting for the victim to arrive").

**{¶65}** Ohio's complicity statute provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense."  R.C. 2923.03(A)(2); *State v. Johnson*, 8th Dist. Cuyahoga No. 106141, 2018-Ohio-4023, ¶ 10.   Under R.C. 2923.03(F), "[a] charge of complicity may be stated in terms of [that] section, or in terms of the principal offense."  *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 244.   Therefore, "a defendant who is 'indicted for aggravated murder in terms of the principal offense * * * [is] on notice that evidence could be presented that he was either a principal offender, or an aider and abetter.'" *Id.*, quoting *State v. Ensman*, 77 Ohio App.3d 701, 703, 603 N.E.2d 303 (11th Dist.1991).   And in Ohio, when an individual acts to aid or abet a principal in the commission of an offense, the individual and principal are equally guilty and the individual is prosecuted and punished as if he were a principal offender.   *See* R.C. 2923.03(F).   Furthermore, the state is not required to prove the identity of the principal offender in order to establish the offense of complicity.   *State v. Crosby*, 8th Dist. Cuyahoga No. 106504, 2018-Ohio-3793, ¶ 9, citing *McKelton* at ¶ 247.

**{¶66}** To support a conviction for complicity by aiding and abetting, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 245-246,

2001-Ohio-1336, 754 N.E.2d 796. The accused must therefore "'have taken some role in causing the commission of the offense.'" *State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81, ¶ 39 (8th Dist.), quoting *State v. Howard*, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459, ¶ 23. Mere presence of an accused at the scene of the crime, alone, is not sufficient to prove that the accused was an aider and abettor. *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982).

{¶67} Aiding and abetting, including the requisite intent, may be inferred from the circumstances surrounding the crime, including presence, companionship, and conduct before and after the offense is committed. *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971); *State v. Sanders*, 8th Dist. Cuyahoga No. 106744, 2018-Ohio-4603, ¶ 11.

{¶68} Here, the video shows a group of four individuals, whom Wingfield admits includes himself, exit a Camry that parked on Euclid Avenue near the Bank Nightclub. The Camry had been rented by an individual named Lakita Drake. The video then shows the four individuals walking together toward the Bank Nightclub and then returning to the vehicle, reentering the Camry. The four men sit and wait in the Camry for approximately 45 minutes. Then Wingfield alone is seen exiting the vehicle. He walks toward the club and returns approximately one minute later, taking his seat in the back passenger side of the Camry. Wingfield conceded in his jailhouse phone call that he had been in the club and he got in the car.

{¶69} Approximately ten minutes after Wingfield returns to the Camry, the video shows several individuals running eastbound, away from the club, and then the Camry's brake lights light up. Mangham and Hollowell are seen running by the Camry. The video shows a flash coming from the direction of the passenger side of the Camry. The detective identified the flash as gunfire. Mangham is seen falling to the ground. The video then shows the Camry pulling forward as flashes from a gun are fired in Mangham's direction from the passenger side of the vehicle.

{¶70} Additionally, in his jailhouse phone calls, Wingfield refers to three other individuals in the vehicle with him, referring to "Woody and D" and then "me and Chris."[2] Wingfield also states that if no one says anything, then they're "cool."

{¶71} We find that in construing the evidence in a light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Wingfield actively participated in Mangham's murder. The evidence shows more than mere presence. After several minutes waiting in the car with the others, Wingfield alone walks toward the nightclub, returning to the car almost immediately, and only minutes later, shots coming from the Camry are fired at Mangham. Wingfield argues that the flashes can only be seen coming from the front passenger window. He also argues that his jailhouse calls do not reveal he had a gun, that he walked from the car to

---

[2] Both defense counsel and the prosecutor provide this quote in their appellate briefs, interpreting Wingfield's comment to say "and then Woody and *he* said me and Chris were shooting." However, upon review of the state's audio exhibit of the recorded jailhouse calls, this court concludes that Wingfield actually refers to "Woody and *D*."

the club, or where the individuals were seated in the Camry. None of these claims, however, negate Wingfield's participation as an aider or abettor. Wingfield admitted entering the car, from which gunfire erupted, after leaving the club. Under these circumstances, a reasonable factfinder could infer that Wingfield "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime" and shared the criminal intent of the principal.

{¶72} We therefore find a rational trier of fact could infer from the circumstances that Wingfield was complicit in Mangham's murder.

{¶73} We further find that construing the evidence in a light most favorable to the prosecution, a rational factfinder could have concluded beyond a reasonable doubt that Wingfield, either as a principal or an accomplice, formulated a plan to kill Mangham. Wingfield, along with three other individuals, parked their Camry down the street from the club where Wingfield admitted he had been and the evidence showed Mangham had been. Wingfield then laid in wait in the vehicle for 45 minutes. After waiting for 45 minutes, Wingfield alone exited the car and walked in the club's direction, only to return to the vehicle one minute later. Shortly thereafter, when Mangham appeared on the sidewalk directly in front of the Camry, gunfire erupted from the vehicle and Mangham was shot several times, including a fatal shot to the head. This evidence demonstrates that Wingfield gave thought to the murder site and the murder did not result from a sudden eruption of events. Thus, a rational trier of fact could reasonably infer prior calculation and design from the circumstances.

## C.   Victims Jones, Russell, and Williams

**{¶74}** Wingfield argues that the state failed to present sufficient evidence that Wingfield shot Jones, Russell, and Williams because these individuals are not identified in the video, there was another altercation at the club that caused people to run, and the number of casings recovered do not match the number of victims.

**{¶75}** Here, Officer O'Brien testified that he responded to a call about shots being fired in the area of East Fourth Street and Euclid Avenue.   Bullet casings were later recovered from that area.   When the officer responded to the scene, he observed many people running and many people exiting the club on Euclid Avenue.   He observed Russell, with a gunshot wound in her leg, in that area.   Officer Laska also responded to the scene for a report of shots fired.   Responding to the scene, Officer Laska observed people running, and he discovered Williams, with a gunshot wound to his leg, hiding under a pickup truck in the vicinity of East Fourth Street and Prospect.   Detective McGrath responded to the hospital for a report of a male with a gunshot wound.   The detective learned that the male, identified as Jones, had been at a downtown bar.   No other shots were reported that night other than the shots from the Camry.

**{¶76}** A factfinder could reasonably infer from these facts that Jones, Russell, and Williams were in fact shot where Mangham was shot upon exiting the Bank Nightclub. It is entirely possible that the victims had not been captured on the limited camera views, because the officers testified that there were a lot of people running.   And although only five bullet casings were recovered at the scene, the factfinder could infer that additional

bullet casings landed inside the shooter's car and were later removed when the vehicle was cleaned. Thus, the state has presented sufficient evidence supporting Wingfield's convictions relating to Jones, Russell, and Williams.

{¶77} Accordingly, Wingfield's second assignment of error is overruled.

## V. Manifest Weight

{¶78} In his third assignment of error, Wingfield contends that his convictions are against the manifest weight of the evidence.

{¶79} A manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541. Also, unlike a challenge to the sufficiency of the evidence, a manifest weight challenge raises a factual issue.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A finding that a conviction was supported by the manifest weight of the evidence, however, necessarily includes a finding of sufficiency. *Howard*, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459, at ¶ 14, citing *Thompkins* at 388.

{¶80} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d

212 (1967), paragraph one of the syllabus. Although the reviewing court considers the credibility of witnesses in a challenge to the manifest weight of the evidence, it does so "with the caveat that the trier of fact is in the best position to determine a witness' credibility through its observation of his or her demeanor, gestures, and voice inflections." *State v. Campbell*, 8th Dist. Cuyahoga Nos. 100246 and 100247, 2014-Ohio-2181, ¶ 39. "'Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility.'" *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, ¶ 56, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997).

{¶81} Wingfield essentially argues that the detective was not credible because he used hearsay to identify him in the video, and the trial court "simply believed" the detective. He also argues that the video surveillance footage was not trustworthy because it was blurry and does not show the shooter's face or where the individuals are seated in the Camry. Finally, Wingfield argues there is no evidence to support his convictions concerning the three surviving victims.

{¶82} We note initially that we determined in the defendant's first assignment of error that the detective's identification of Wingfield and the other individuals in the Camry was not hearsay. Rather, Wingfield's own admission places him in the car at the scene. The trial court presumably considered the detective's testimony for proper

purposes, and there is no evidence to the contrary. The trial court viewed the same video surveillance and made its own determinations based upon its own review of the footage.

{¶83} Finally, the evidence shows that Russell and Williams were discovered by officers responding to the scene of a shooting. The officers observed gunshot wounds to the victims' legs. The evidence recovered on the scene included bullet casings and video surveillance that captured gunfire coming from the Camry that Wingfield had been seen entering moments before. Additionally, Wingfield admitted leaving the club and getting in the car in the video footage. Although the detective did not discover Jones at the scene, he learned that Jones had been at a downtown bar earlier that evening. The detective observed a gunshot wound in Jones's leg as well.

{¶84} Accordingly, we find that this case is not the exceptional case where the factfinder lost its way in finding Wingfield guilty of all charges.

{¶85} Wingfield's third assignment of error is overruled.

{¶86} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of

the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN T. GALLAGHER, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR