[Cite as *State v. Sopko*, 2025-Ohio-3280.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                  :

    Plaintiff-Appellee,                    :

                                   No. 114604

    v.                                                  :

STEVEN SOPKO, JR.,                          :

    Defendant-Appellant.              :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 11, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-689951-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Eric Collins, Kory Roth, and Chad Cleveland, Assistant Prosecuting Attorneys, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Francis Cavallo, Assistant Public Defender, *for appellant*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Defendant-appellant Steven Sopko, Jr. appeals from his judgment of conviction, rendered after a jury trial, for aggravated murder and associated crimes. After a thorough review of the facts and pertinent case law, we affirm.

**Procedural History**

{¶ 2} The victim in this case was a 14-year-old boy who died on November 5, 2023, after sustaining 15 gunshot wounds on that same date. In December 2023, Sopko was charged in juvenile court with the murder of the victim; he was arrested in January 2024. In March 2024, the juvenile court bound Sopko over to adult court and thereafter a grand jury charged him with one count of aggravated murder, two counts of murder, and two counts of felonious assault; all counts contained one- and three-year firearm specifications.

{¶ 3} Prior to trial, the defense filed the following five motions in limine to exclude (1) other acts evidence in relation to an October 2023 shooting and photographs of Sopko holding firearms; (2) photographs from the victim's autopsy; (3) video of a gun transaction; (4) firearm toolmark testimony; and (5) historical cell phone site location testimony.

{¶ 4} In response, the State agreed that it would (1) not mention the other October 2023 act, except for the National Integrated Ballistic Information Network ("NIBIN") lead from the incident; (2) not show video of the gun transaction; and (3) limit the 260 autopsy photographs it had to 98. The State did not make any concessions regarding the firearm toolmark or historical cell phone site location evidence.

{¶ 5} Regarding the firearm toolmark testimony, the trial court stated that courts generally accept such testimony. The defense acknowledged that many courts, including this court, have accepted the testimony as proper but stated that it

raised the issue because there are some courts that have not accepted it. Regarding the historical cell phone site location testimony, the court stated that it allowed such testimony in prior trials and believed that any issues regarding it went to the weight or veracity of the testimony rather than the admissibility. The trial court overruled the defense's objections to the firearm toolmark and historical cell phone site location testimony.

{¶ 6} At the conclusion of the State's case, the defense made a Crim.R. 29 motion for judgment of acquittal, which the trial court denied. The defense did not present any witnesses. After its deliberations, the jury found Sopko guilty on all the charges and specifications. The trial court sentenced Sopko to 31 years to life in prison. The following facts gave rise to the conviction.

**Facts as Elicited at Trial**

{¶ 7} During the course of this murder investigation, the police obtained numerous cell phones. Data from the cell phones — including social media accounts — were instrumental in the investigation, Sopko's arrest, and ultimately the conviction.

{¶ 8} At the time of the incident, November 5, 2023, Sopko was dating a female named Jasmine, who was pregnant. Jasmine lived on Holyrood Road in Cleveland. Her home was located in the area of East 90th Street and Edmunds Avenue. Sopko's mother lived on Dorothy Avenue in Parma, and his uncle lived on Neville Avenue in Cleveland.

**{¶ 9}** The fatal shooting of the victim occurred at approximately 6:20 p.m. in the area of East 90th Street and Edmunds Avenue. Initially, the police did not have leads or suspects and sought anonymous tips from the public through the Crime Stoppers program. On November 8, 2023, the lead detective, Brian Kellums, received an investigative lead that a person associated with a "geteven_22" Instagram account was involved with the shooting. Further, on November 13, 2023, the police got an anonymous tip through Crime Stoppers. Detective Kellums testified about the tip.

**{¶ 10}** The tipster stated that a male named Steven was responsible for the victim's murder. According to the tipster, Steven and the victim were walking from the house where Jasmine, Steven's girlfriend, lived on Holyrood Road. At one point, Steven stopped walking, bent down, and pretended to tie his shoelace. The victim kept walking, and with his back to Steven, Steven shot him in the back. The tipster provided the police with a telephone number for Steven and an Instagram account of "geteven_22."

**{¶ 11}** The following day, Detective Kellums obtained video surveillance from a home in the area where the tipster said Steven and the victim had been walking; two vantage points were captured on video. One of the vantage points showed two males — one of whom was the victim and the other one who was dressed in all dark clothing — walking down Holyrood Road. It showed the individual dressed in dark clothing shooting at the victim as they crossed the street. The victim fell in the street, and the shooter fired more shots as the victim lay in the street. At one point, the

shooter started to turn to walk away, but paused for a moment, fired at least one other shot, then ran away. Distance and obstructions on the videos (i.e., trees) did not provide a close-up view of the victim and shooter.

{¶ 12} Detective Kellums researched the phone number the tipster provided and discovered it belonged to Sopko; he also gained access to the "geteven_22" Instagram account. The detective also obtained a photograph of Sopko from a law enforcement database, compared it to photographs on the "geteven_22" Instagram account, and concluded it was Sopko's account.

{¶ 13} Detective Kellums obtained tracking data for Sopko's cell phone, and an FBI agent provided testimony that the data demonstrated that Sopko's phone was in the area of Holyrood Road and East 90th Street at the time of the shooting. The agent further testified that, between 6:18 p.m. and 6:28 p.m., the cell phone changed locations in the cell tower sector, which could have been indicative of the person with the phone running away.

{¶ 14} A Secret Service agent also testified about the cell phone's location during the relevant time. The agent corroborated the FBI agent's testimony that the phone was in the area at the time of the shooting. According to the Secret Service agent, after the shooting, the cell phone was in the area of Neville Avenue, where Sopko's uncle lived, and then on Dorothy Avenue in Parma, where Sopko's mother lived. The data further revealed that the phone's location was shared with Sopko's uncle at 6:22 p.m., and it showed the phone's location was Holyrood Road.

{¶ 15} The evidence demonstrated that from November 9 through November 11, 2023 (after the murder of the victim), Sopko advertised on Instagram that he was selling a Glock 19 weapon. On November 10 and 11, 2023, Sopko posted on Instagram that he was in the market for another Glock weapon. Two weeks later, Sopko posted a video of a new weapon, a Glock 17.

{¶ 16} In December 2023, prior to Sopko's arrest, an individual named Taiwon McCarthy was arrested on an unrelated matter and a Glock 19, 9 mm firearm was recovered from him.[1] The gun had an extended magazine and laser sight affixed to the front. The gun recovered from McCarthy was submitted for NIBIN testing, which revealed that there was a match between the gun and the casings collected from the crime scene in this case. Based on casings recovered from this crime scene and fragments recovered from the victim's body during his autopsy, a firearms expert from the Cuyahoga County Regional Forensic Science Lab opined that the gun recovered from McCarthy was the gun used in the subject fatal shooting.

{¶ 17} Detective Kellums also obtained Instagram accounts belonging to Jasmine (two accounts), McCarthy, and the victim. Further, the police investigated accounts that the victim's mother gave to them, including one named "9lock," which was determined to belong to another 14-year-old boy. The accounts did not reveal any relationship between McCarthy and the victim. The police also obtained a search warrant for McCarthy's cell phone; the data from the phone did not place

---

[1] McCarthy's first name was identified in the transcript as Taiwon, but the State represents that his name is Taijuan. *See* appellee's brief, p. 5.

McCarthy in the vicinity of the subject shooting on the day and time at issue. The data showed that McCarthy was on Facetime at the time of the murder. McCarthy was therefore eliminated as a suspect.

{¶ 18} A further review of the Instagram accounts revealed that in the early morning hours of the day of the shooting, before the shooting, the victim was with Sopko's girlfriend, Jasmine, and Jasmine's friend. The victim posted a picture of Jasmine on his account, and later, at 11:00 a.m., Jasmine sent three Instagram messages to the victim.

{¶ 19} Jasmine and Sopko also communicated via Instagram on the day of, prior to, the shooting. Their communications demonstrated trouble in their relationship, with Sopko at one point messaging Jasmine, "[f]ine, I guess. It (sic) over. I want to talk it out . . . . But I get it. You want to leave (sic) a life without me. I understand . . . I'm just going to block you and if you want you have your mom call me when you're having the baby but bye."

{¶ 20} The Instagram accounts further demonstrated that Sopko and the victim communicated with each other the day before the shooting.

{¶ 21} Further, on the day of the murder, in the 3:00 p.m. hour, the victim and the other 14-year-old associated with the "9lock" account were messaging about "9lock" buying a gun from the victim because the victim said he "got dis 19." Shortly thereafter, the victim sent a picture of a firearm with a beam and said that the beam worked. The victim messaged "9lock" "to pull through here"; "here" referred to East 93rd Street and Hough Avenue in Cleveland. Detective Kellums testified that East

93rd Street and Hough Avenue is "fairly close" to East 90th Street and Edmunds Avenue where the shooting occurred.

{¶ 22} On January 5, 2024, after his location was ascertained by the United States Marshal Task Force, Sopko was arrested at a house in Parma (not his mother's house); a search warrant was obtained for the home. The police recovered a duffel bag with three firearm magazines (not associated with this case), various types of ammunition, and two cell phones (a Nokia and an Apple) from a bedroom containing Sopko's belongings. The Nokia cell phone was not useful to the investigation because the data on it started in December 2023, after the murder, and did not contain any pertinent information.

{¶ 23} The Apple iphone was registered to Sopko and had the same phone number that the anonymous tipster had provided to the police. The data revealed that on December 16, 2023, after the murder but prior to Sopko's arrest, a search — "14-year-old boy dies after being shot in Cleveland" — was performed on the phone. Similar searches were performed on the phone on December 29, 2023. Additionally, the following searches were also made on the phone: "a shooting on 90th and half in Cleveland Ohio"; "what a visionary killer"; "what to do when police take my phone for evidence"; "how to remove wipe iPhone"; things they need to convict you with murderer" (sic); and "Glock 19 beam charger."

{¶ 24} According to Detective Kellums, pictures of Sopko holding a firearm that was similar to the weapon that killed the victim were posted to his "geteven_22" Instagram account on October 20, 21, and 29, 2023 (prior to the murder). There

was also a post on the account prior to the murder where Sopko referenced that he had traded a Sig firearm for a Glock weapon and a statement "I love the Glock." After the murder, on November 8, 2023, Sopko posted a video of himself with what Detective Kellums testified was a weapon similar to the murder weapon; in the video Sopko said "we catch bodies for real." Detective Kellums testified that Sopko's statement was an expression for "killing someone."

{¶ 25} Detective Kellums testified that the Glock gun that was pictured on the victim's Instagram account was similar to the firearm that was pictured on Sopko's Instagram account. A firearms expert from the Cuyahoga County Regional Forensic Science Lab opined that it was the firearm that was recovered during McCarthy's arrest was the same firearm used to kill the victim.

**Assignments of Error**

> I. There was insufficient evidence produced at trial to support a finding of guilt on all counts.
>
> II. The jury lost their way by finding the defendant guilty against the manifest weight of the evidence.
>
> III. The trial court erred by permitting purportedly scientific expert testimony concerning firearm examination that did not meet the standards of a *Daubert* analysis, thus denying appellant his right to a fair trial under the U.S. Constitution and the Constitution of the State of Ohio.
>
> IV. The trial court erred by permitting purportedly scientific expert opinion testimony concerning cell site location data that did not meet the standards of a *Daubert* analysis, thus denying appellant his right to a fair trial under the U.S. Constitution and the Constitution of the State of Ohio.

V. The cumulative errors committed during the trial deprived the appellant of a fair trial.

**Law and Analysis**

{¶ 26} In his first assignment of error, Sopko contends that the evidence was insufficient to sustain the conviction on all counts.

{¶ 27} A sufficiency challenge requires a court to determine whether the State met its burden of production at trial. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In reviewing for sufficiency, we do not make a determination of the credibility of the evidence; rather, we consider whether, if credible, the evidence presented would sustain a conviction. *Id.* The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

{¶ 28} In this assignment of error, Sopko first contends that the State failed to present sufficient evidence to prove the identity of the shooter.

{¶ 29} The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *State v. Wingfield*, 2019-Ohio-1644, ¶ 51 (8th Dist.). Circumstantial and direct evidence are of equal evidentiary value. *Id.* at ¶ 52, citing *State v. Santiago*, 2011-Ohio-1691, ¶ 12 (8th Dist.). The differences between direct and circumstantial evidence are irrelevant to the probative value of

the evidence. *Wingfield* at *id.*, citing *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.).

{¶ 30} This court has previously held that circumstantial evidence may be sufficient to establish the identity of the accused as the person who committed the crime. *Wingfield* at ¶ 53, citing *In re A.W.*, 2016-Ohio-7297, ¶ 28 (8th Dist.). Further, a conviction may be sustained based solely on circumstantial evidence. *Wingfield* at *id.*, citing *State v. Franklin*, 62 Ohio St.3d 118 (1991). Indeed, in some cases, circumstantial evidence may be "more certain, satisfying and persuasive than direct evidence." *Wingfield* at *id.*, citing *State v. Lott*, 51 Ohio St.3d 160, 167 (1990).

{¶ 31} Sopko admits that the State may have proved that he owned a Glock 19, that he, or at least his phone, was in the area of the murder, and that he had been in contact with the victim via social media prior to the shooting. *See* appellant's brief, p. 8. Sopko contends, however, that "nothing introduced into evidence during this trial established the identity of the shooter." We disagree.

{¶ 32} In addition to the evidence Sopko admits the State may have proved, the tipster who contacted Crime Stoppers identified Steven, which is Sopko's first name, as the shooter. Social media accounts established that Sopko and the victim knew each other and had been in contact prior to the murder.

{¶ 33} According to the tipster, Steven and the victim were walking from the house where Jasmine, Steven's girlfriend, lived on Holyrood Road. It was undisputed that Sopko was dating Jasmine at the relevant time. At one point, Steven stopped walking, bent down, and pretended to tie his shoelace. The victim kept

walking, and with his back to Steven, Steven shot him in the back. The tipster's information was at least partially corroborated by the surveillance video evidence.

{¶ 34} Searches performed from Sopko's phone after the murder — such as "14-year-old boy dies after being shot in Cleveland" — were additional circumstantial evidence to prove Sopko's identity as the shooter. Further, three days after the murder, Sopko posted a video of himself with what Detective Kellums testified was a weapon similar to the murder weapon; in the video Sopko said "we catch bodies for real." Detective Kellums testified that Sopko's statement was an expression for "killing someone."

{¶ 35} On this record, there was sufficient evidence to prove Sopko's identity as the shooter.

{¶ 36} Sopko also contends in this assignment of error that the State failed to present sufficient evidence of prior calculation and design to support the aggravated murder conviction.

{¶ 37} Sopko was charged with and convicted of aggravated murder under R.C. 2903.01, which, relevant to this case, prohibits a person from "purposely, and with prior calculation and design, caus[ing] the death of another." R.C. 2903.01(A). "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "In determining whether a defendant acted purposely, '[a] defendant's state of mind

may be inferred from the totality of the surrounding circumstances.'" *State v. Patel*, 2008-Ohio-4693, ¶ 34 (9th Dist.), quoting *State v. Sullivan*, 2008-Ohio-2390, ¶ 10 (9th Dist.).

{¶ 38} "'Prior calculation and design' denotes 'sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation' coupled with circumstances that demonstrate 'a scheme designed to implement the calculated decision to kill[.]'" *State v. Guerra*, 2013-Ohio-5367, ¶ 6 (9th Dist.), quoting *State v. Cotton*, 56 Ohio St.2d 8 (1978), paragraph three of the syllabus. A prolonged period of deliberation is unnecessary, and "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264 (2001). There is no bright-line test for determining whether a defendant acted with prior calculation and design, so courts consider the totality of the circumstances in each case. *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997).

{¶ 39} The State can prove "prior calculation and design" from the circumstances surrounding a murder in several ways, including (1) "evidence of a preconceived plan leading up to the murder"; (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded"; or (3) "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Orr*, 2014-Ohio-4680,

¶ 75 (8th Dist.), citing *State v. Dunford*, 2010-Ohio-1272, ¶ 53 (11th Dist.); *see also State v. Hough*, 2010-Ohio-2770, ¶ 19 (8th Dist. ) ("[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design.").

{¶ 40} The Ohio Supreme Court has identified several other factors to be weighed along with the totality of the circumstances surrounding the murder when determining whether the defendant acted with prior calculation and design, including (1) whether the defendant and the victim knew each other and, if so, whether the relationship was strained, (2) whether there was thought or preparation in choosing the murder weapon or murder site, and (3) whether the act was "drawn out" or "an almost instantaneous eruption of events." *Taylor* at *id.*, citing *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist. 1976).

{¶ 41} The State presented evidence, if believed, to support that Sopko acted with purpose and prior calculation and design. The State presented evidence that the victim and Sopko knew each other and the victim was spending time with Sopko's girlfriend at a time when Sopko and the girlfriend were experiencing trouble in their relationship. The forensic evidence placed Sopko at the scene of the murder, at the time of the murder. Sopko was captured on surveillance video walking with the victim. Sopko stopped walking, bent down — ostensibly to tie his shoelace — and with the victim's back to him, shot him. After he shot the victim and the victim was on the ground, Sopko started to walk away, but not before shooting the victim at least one more time. The victim sustained 15 gunshot wounds. Days after the

murder, Sopko posted a video of himself on social media with a Glock 19 weapon and stated "we catch bodies for real." Detective Kellums testified that Sopko's statement was an expression for "killing someone."

{¶ 42} The evidence was sufficient to support that Sopko acted with purpose and prior calculation and design.

{¶ 43} The first assignment of error is overruled.

{¶ 44} For his second assignment of error, Sopko contends that the conviction was against the manifest weight of the evidence.

{¶ 45} A challenge to the manifest weight of the evidence "addresses the evidence's effect of inducing belief . . . . In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 46} Sopko advances the same arguments he advanced for his sufficiency of the evidence — that the State did not prove that he was the shooter and did not prove purpose and prior calculation and design. We find that the State presented

substantial evidence that Sopko was the shooter and that he acted with purpose and prior calculation and design.

{¶ 47} In sum, the evidence demonstrated that Sopko's pregnant girlfriend, Jasmine, had been hanging around the victim before the murder and, as Sopko surmised, wanted to start a life without him. Sopko and the victim had a connection, not only through Jasmine, but directly with each other as the digital data showed they had communicated. Sopko's cell phone data put him in the very area of the shooting, at the time of the shooting. After the murder, an anonymous tipster identified Steven as the shooter and provided the police with a cell phone number and Instagram account that belonged to Sopko. Also after the murder, Sopko shared his location with his uncle and asked him to pick him up on Holyrood Road. Further, Sopko was showing off his gun — a similar gun was scientifically proven as the gun used to kill the victim — both before and after the murder. Moreover, Sopko searched the victim's murder on his phone. This was not the exceptional case that warrants reversal for a new trial.

{¶ 48} The second assignment of error is overruled.

{¶ 49} In his third assignment of error, Sopko challenges the trial court's decision to allow expert firearm toolmark testimony on the weapon recovered from McCarthy and shown to be the murder weapon. Sopko contends that the testimony did not meet the admissibility requirements for scientific evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which Ohio adopted in *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607 (1998).

{¶ 50} The admission or exclusion of evidence is a matter left to the trial court's sound discretion and will not be disturbed absent an abuse of discretion. *State v. Dunn*, 2015-Ohio-3138, ¶ 40 (8th Dist.). An abuse of discretion arises when the court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 51} In *Daubert*, the United States Supreme Court set forth a list of five nonexhaustive factors for courts to consider when determining whether scientific evidence is reliable. *Id.* at 593-594. These factors include (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review; (3) whether a particular scientific technique has a known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) whether the methodology has gained general acceptance. *Id.* at 593-594. These factors are intended to assist the trial court in its duty to ensure that expert testimony is based on the scientific method. *Id.* at 590.

{¶ 52} Further, Evid.R. 702, which governs the admissibility of expert testimony, permits a witness to testify as an expert when (1) the witness's testimony relates to matters beyond the knowledge or experience of a lay person; (2) the witness has specialized knowledge, skill, experience, training, or education regarding the subject matter of his or her testimony; and (3) the witness's testimony is based on reliable, scientific, technical or specialized information. *State v. Carr*, 2010-Ohio-2764, ¶ 23 (1st Dist.).

{¶ 53} The toolmark expert in this case testified that her opinions were based on the standards set forth by the Association of Firearm and Toolmark Examiners ("AFTE"). Sopko cites several federal cases that have discussed what they believe to be shortcomings in AFTE's standards.[2] Ohio courts, including this court, have accepted testimony based on AFTE standards, however. *See State v. Fuell*, 2021-Ohio-1627, ¶ 52; *State v. Smith*, 2021-Ohio-378, ¶ 23 (8th Dist.); *State v. Potts*, 2017-Ohio-4435, ¶ 31 (8th Dist.); and *State v. Walter*, 2008-Ohio-3457, ¶ 7 (8th Dist.). We decline to revisit this issue and will follow this court's precedent.

{¶ 54} The third assignment of error is overruled.

{¶ 55} For his fourth assigned error, Sopko contends that the trial court erred by allowing expert testimony about cell phone location. Again, we review for an abuse of discretion. *Dunn*, 2015-Ohio-3138, at ¶ 40 (8th Dist.).

{¶ 56} This court has held that testimony concerning "(1) appellant's cell phone records, and (2) the location of the cellular towers used by appellant's phone in relation to other locations . . . is lay opinion testimony that does not require 'specialized knowledge, skill, experience, training, or education' regarding cellular networks." *State v. Daniel*, 2016-Ohio-5231, ¶ 69 (8th Dist.), quoting Evid.R. 702(B), *discretionary appeal denied*, 2017-Ohio-1427. Thus, this court held that the testimony is not subject to an Evid.R. 702 and *Daubert* analysis. *Id.*;

---

[2] Sopko cites *United States v. Tibbs*, 2019 D.C. Super. LEXIS 9; *United States v. Monteiro*, 407 F. Supp. 2d 341 (D. Mass 2006); *United States v. Green*, 405 F. Supp. 104, * 18 (D. Mass. 2005); *United States v. Glynn*, 578 F.Supp.2d 567 (S.D.N.Y. 2008); and *United States v. Romero-Lobato*, 379 F.Supp. 3d 1111, 1122 (D. Nev.).

*see also State v. Lucus*, 2020-Ohio-1602 (8th Dist.); *State v. Johnson*, 2018-Ohio-1389 (8th Dist.), *discretionary appeal denied*, 2018-Ohio-3258, *reopening denied*, 2018-Ohio-5151; *Dunn* at ¶ 44.

{¶ 57} In *Johnson*, for example, a Cleveland police crime analyst was accepted by the trial court as an expert witness and testified that cell phone data placed the defendant's phone near the crime scene at the time of the crime. The analyst admitted that "cell tower data is not precise because the towers cover an area roughly a quarter of a mile in size," but he determined the defendant was in that general area at the time of shooting. *Id.* at ¶ 12. On appeal, this court held that the trial court did not abuse its discretion by allowing the testimony, finding that the analyst's "testimony was primarily lay witness testimony, and he was competent to testify." *Id.* at ¶ 27.

{¶ 58} Here, two witnesses testified about data from Sopko's cell phone: an FBI agent and a Secret Service agent. The FBI agent, who had performed 50 to 100 cell phone analyses, testified as an expert witness. He explained that part of his routine job requirements was to serve as a "cast qualified agent." The agent explained his responsibility as a cast qualified agent as follows:

> [We] conduct a historical cellular analysis where we take call detail records that were historical in nature, we review those records and create a visualization, a presentation that we are — we provide back to the prosecutors or whoever requested it to assist in criminal investigations.

Tr. 392-393.

{¶ 59} The agent then explained how cell phones can show location data:

[I]n general your phone has an antenna in it. That antenna, when you hit "call" on your cell phone reaches out through the cellular network connecting to a cellular tower in milliseconds. That network then sends it to the device or other thing you are making contact with . . . and then it sends that information back and forth and that's how your connection is made and that's where your voice calls are . . . [W]hen you make that call [the cell phone companies] want to make sure that everything is working properly. So they keep records of those transactions.

*Id.* at 393-394.

{¶ 60} The FBI agent testified as to how he performs his analysis by combining the call detail records and the cell phone tower records "to identify an approximate area where a cell phone was when" it pinged. *Id.* at 394. The FBI agent acknowledged the limitations of historical cell phone analysis.

{¶ 61} As with the testimony in *Daniel*, 2016-Ohio-5231 (8th Dist.), and *Johnson*, 2018-Ohio-1389 (8th Dist.), the FBI agent's testimony here was lay, not expert, testimony. The agent simply testified that when someone uses their cell phone, it connects to a nearby cell tower. Based on the data from Sopko's cell phone provider, the agent compiled a map of the possible locations of Sopko's cell phone during the relevant time frame — there was no specialized knowledge, skill, training, or education involved in the agent's mapping of Sopko's cell phone location. Any potential flaws with the cell phone data went to the weight of the data, not its admissibility. *See State v. Wilson*, 2017-Ohio-2980, ¶ 33 (8th Dist.), quoting *State v. Daniel*, 2016-Ohio-5231, ¶ 70 (8th Dist.) (Any "'potential problems with estimating a cell phone's location based on phone records' go to the weight of the cellular testimony not its reliability or admissibility.").

{¶ 62} The fourth assignment of error is overruled.

{¶ 63} For his final assignment of error, Sopko contends that the effect of the trial court's cumulative errors denied him a fair trial, warranting reversal under the cumulative-error doctrine.

{¶ 64} Under the cumulative-error doctrine, a trial court's judgment may be reversed if the cumulative effect of multiple errors prevents a fair trial even though each of the individual errors, standing alone, would not constitute grounds for reversal. *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). The cumulative-error doctrine does not apply in cases where there are not multiple errors. *State v. Williams*, 2023-Ohio-2296, ¶ 103 (8th Dist.). Because there were no errors committed by the trial court in this case, the cumulative-error doctrine is inapplicable.

{¶ 65} The fifth assignment of error is overruled.

{¶ 66} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

LISA B. FORBES, P.J., and
WILLIAM A. KLATT, J.,* CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)